UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


MARIE RHODES CHIPLEY, INDIVIDUALLY
AND AS PERSONAL REPRESENTATIVE OF
THE DECEDENT, MICHAEL WILLIAM RHODES,
FOR AND ON BEHALF OF ALL WRONGFUL
DEATH BENEFICIARIES AND AS
ADMINISTRATRIX OF THE ESTATE OF
MICHAEL WILLIAM RHODES, DECEASED                    PLAINTIFF

VS.                          CIVIL ACTION NO. 3:16cv901TSL-RHW

YAZOO COUNTY, MISSISSIPPI; SHERIFF
JACOB SHERIFF, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY; SERGEANT
SHARKEY BROWLOW, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY; CAPTAIN GARY
EDWARDS, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; SANDRA BANKS,
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY; WARDEN MARY RUSHING,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY           DEFENDANTS


MEMORANDUM OPINION AND ORDER

On December 24, 2014, less than twelve hours after being
arrested and incarcerated in the Yazoo County Regional
Correctional Facility, Michael Rhodes committed suicide.  His
daughter, Marie Rhodes Chipley, for herself and on behalf of
Rhodes' estate and wrongful death beneficiaries, filed the present
lawsuit under 42 U.S.C. § 1983 alleging violations of Rhodes'
constitutional rights by Yazoo County; Yazoo County Regional
Correctional Facility (YCFCF); the arresting officer, Simon
Stubblefield; Yazoo County Sheriff Jacob Sheriff; YCRCF Warden

Mary Rushing[1]; YCRCF Captain Gary Edwards; and various jail employees, including Sergeant Sharkey Brownlow, Sandra Banks and Sederick Clark. She also included a state law cause of action for negligence. The case is presently before the court on separate motions for summary judgment by defendant Sharkey Brownlow, in his individual capacity,[2] and by defendants Sheriff, Rushing, Edwards and Banks, in their individual capacities.[3] Plaintiff has responded in opposition to the motions. The court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that Brownlow's motion should be denied and the motion of Sheriff, Rushing, Edwards and Banks should be granted.

Background Facts

The following undisputed facts are drawn from the record evidence.[4] On December 23, 2014, the Yazoo County Sheriff's Office received a report that plaintiff's decedent, Michael

_____

[1] Mary Rushing was the warden, and Gary Edwards a deputy warden at YCRCF at the time of Michael Rhodes' death. Gary Edwards became warden in January 2015 when Rushing left to take a job with the Hinds County Sheriff's Department.

[2] This is Brownlow's second motion for summary judgment. The first was dismissed without prejudice and a second motion promptly refiled.

[3] There were originally two more movants, Shirley Paige and Sederick Clark; however, after the motion was filed, plaintiff voluntarily dismissed those defendants.

[4] The court will note where facts are in dispute.

Rhodes, had run off the road and damaged some property and then left the scene. Deputies Simon Stubblefield and Dave Collins, responding to this call, separately drove to Rhodes' residence. When they arrived, they found Rhodes sitting in his vehicle in the woods near his home; the vehicle was stuck in the mud. Family members at the scene reported that Rhodes, who had been drinking, was in the vehicle with a gun to his head, threatening to harm himself. The family asked the officers to back off, since Rhodes was reportedly upset by their presence. The officers backed away for about twenty minutes, and after the family was able to get the gun away from Rhodes, they returned at the family's request and took Rhodes into custody.[5] Stubblefield then transported him to the Yazoo County Regional Correctional Facility.

Because it was apparent to Stubblefield that Rhodes was intoxicated and unable to walk, he radioed ahead to the jail to request assistance with Rhodes. When they arrived at the jail, they were met by Sergeant Sharkey Brownlow, who was working as a floor supervisor at the jail. Brownlow helped get Rhodes out of the car and into the jail. Once inside the jail, Brownlow and Stubblefield took Rhodes into the booking room. Brownlow told the

---

[5] As to the basis for the arrest, Stubblefield has explained that the family was still concerned that Rhodes might harm himself or someone else. He further stated that he had authority to arrest Rhodes for leaving the scene of an accident, destruction of private property and possible DUI.

booking officer, Sandra Banks, to skip the standard booking procedure, ostensibly because Rhodes was too intoxicated to answer questions.[6] Stubblefield helped Brownlow get Rhodes changed into inmate clothing and together, they helped Rhodes walk to a segregation/isolation cell. Stubblefield then departed the jail. Brownlow checked on Rhodes a couple or a few times during the night and in the early morning hours (though the evidence as to how often is contradictory). When Brownlow checked on Rhodes around 5:30 a.m. on December 24, he discovered that Rhodes had committed suicide; he had used the sheet to make a noose and hanged himself from the top bunk. Strips of sheet were found hanging from the light fixture and a chair in the cell, suggesting failed attempts at suicide.

At the time of Mr. Rhodes' suicide, YCRCF had in place a "Suicide Plan for County Offenders", which provided, among other requirements, that:

1. All threats ... of intentional self-injury shall be taken seriously and **REPORTED IMMEDIATELY TO MEDICAL STAFF** for directions and appropriate medical treatment and mental health evaluation. ...

---

[6] Brownlow testified that he tried to talk to Rhodes when Rhodes arrived at the jail but Rhodes "just wasn't saying anything. He just wasn't responding. ... He wouldn't say anything. He just didn't respond to me." According to Stubblefield, however, while Rhodes was too intoxicated to walk, he had no problem communicating and was cooperative in providing information that Stubblefield needed to fill out his arrest card/report.

**2. An officer must stay with the offender at all times.**

3. The offender is to be placed in the medical isolation cell (C1006) for continual observation by an officer.

4. Offender should be dressed out in suicide watch garments, and all items must be removed from the cell that may be used to injure him/her self (pants, shirts, linens, towels, razors, strings of any kind, etc).

5. Once the offender is dressed in suicide garments and all items have been removed from the offender, a correctional officer will be posted outside the medical isolation cell to physically observe the offender.

6. **Offender must be under CONTINUOUS observation AT ALL TIMES.**

(Emphasis in original). There was also a written policy requiring that "[i]nmates who have ... exhibited suicidal tendencies will be housed in a more secure location than the general population. Correctional Staff will observe these inmates no less frequently than fifteen (15) minute intervals." And, there were segregation policies which required that inmates in segregation "be personally observed by a correctional staff member at least every **FORTY (40)** minutes on an irregular schedule. ... Suicidal inmates shall be under continuous observation...." It is undisputed that none of these policies was followed in the case of Michael Rhodes.

All the individual defendants have moved for summary judgment as to plaintiff's § 1983 claims against them in their individual capacities on the basis of qualified immunity. They also contend they are entitled to immunity under the Mississippi Tort Claims

Act (MTCA), Miss. Code Ann. § 11-46-1, *et seq*. as to plaintiff's state law claim for negligence.

### Section 1983 and Qualified Immunity

Section 1983 prohibits the deprivation of constitutional rights under color of state law. <u>See</u> 42 U.S.C. § 1983. To establish personal liability in a § 1983 action, the plaintiff must prove that the defendant official, acting under color of state law, caused the deprivation of a right secured by the Constitution or laws of the United States. <u>Anderson v. Valdez</u>, 845 F.3d 580, 599 (5th Cir. 2016). The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011) (internal quotation marks and citation omitted).

When an official raises qualified immunity, the plaintiff has the burden to overcome the defense by showing that "(1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." Porter v. Epps, 659 F.3d 440, 445 (5th Cir. 2011). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" al-Kidd, 563 U.S. at 741, 131 S. Ct. 2074 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). The Supreme Court has cautioned against defining "'clearly established law ... at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff v. Rickard, --- U.S. ---, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014) (quoting al-Kidd, 563 U.S. at 742, 131 S. Ct. 2074). To find that the law was clearly established, "[the court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." Morgan v. Swanson, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc) (brackets and internal quotation marks omitted) (quoting al-Kidd, 563 U.S. at

7

741, 131 S. Ct. 2074).  That does not mean that there must be a
case "directly on point, but existing precedent must have placed
the statutory or constitutional question beyond debate."  <u>Al-Kidd</u>,
563 U.S. at 741, 131 S. Ct. 2074.[7]

    <u>Summary Judgment Standard</u>

    Under Federal Rule of Civil Procedure 56(a), summary judgment
is required when "the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Typically
on a summary judgment motion, the moving party bears the initial
burden of showing the absence of a genuine issue of material fact.
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548,
2552, 91 L. Ed. 2d 265 (1986).  If the moving party demonstrates
an absence of evidence supporting the nonmoving party's case, then
the burden shifts to the nonmoving party to come forward with
specific facts showing that a genuine issue for trial does exist.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  However, a
government official's good faith assertion of a qualified immunity

---

    [7]    The supervisory defendants have recently filed a motion
for leave to file supplemental authorities in support of their
motion for summary judgment, in which they purport to undertake to
advise the court of recent Supreme Court decisions setting forth
this standard.  As these cases do no more than reiterate this
well-established standard, the court finds their proposed
supplementation superfluous but will allow it to be filed
nevertheless.

defense alters the usual summary judgment burden of proof. Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005).  Once the official asserts qualified immunity, the plaintiff has the burden to show there is a genuine and material dispute as to whether qualified immunity applies.  Castorena v. Zamora, 684 F. App'x 360, 363 (5th Cir. 2017) (citations omitted).  See also Thompson v. Upshur Cty., TX, 245 F.3d 447, 456 (5th Cir. 2001) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.") (internal quotation marks and citation omitted).

    A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  Conversely, "[n]o genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." EEOC v. Simbaki, Ltd., 767 F.3d 475, 481 (5th Cir. 2014).  When evaluating whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398-99 (5th Cir. 2008).  In so doing, the court must draw all reasonable inferences in favor of the nonmoving

party, even on a summary judgment motion based on qualified immunity.  See Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010) ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor.").

Plaintiff's Constitutional Rights and Applicable Standards

Rhodes was a pretrial detainee during his incarceration at YCRCF.  As such, the source of his constitutional rights was the Fourteenth Amendment Due Process Clause.  A pretrial detainee has "a clearly established ... right not to be denied, by deliberate indifference, attention to his serious medical needs."  Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996) (en banc).  This "includes protection from known suicidal tendencies."  Estate of Pollard v. Hood Cty., Tex., 579 F. App'x 260, 265 (5th Cir. 2014).[8]  See Rhyne v. Henderson Cty., 973 F.2d 386, 391 (5th Cir.

---

[8]      "Constitutional challenges by pretrial detainees may be brought under two alternative theories:  as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" Shepherd v. Dallas Cnty., 591 F.3d 445, 452 (5th Cir. 2009) (citing Hare v. City of Corinth, Miss., 74 F.3d 633, 644-45 (5th Cir. 1996) (en banc)).  A challenge to a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement," and is analyzed under the standard of Bell v. Wolfish, which asks whether the condition is "reasonably related to a legitimate governmental objective." Estate of Henson v. Wichita Cty., Tex., 795 F.3d 456, 463 (5th Cir. 2015) (citing Hare, 74 F.3d at 644, and Bell, 441 U.S. 520, 539, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).  "An episodic-acts-or- omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" Id. (quoting Sherherd, 591 F.3d at 452).  This standard requires proof of subjective deliberate indifference to the detainee's constitutional rights.  Scott v. Moore, 114 F.3d 51, 54 (5th Cir.

1992) ("The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights.").

"[A] prison official acts with deliberate indifference when he 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Hinojosa v. Livingston, 807 F.3d 657, 665 (5th Cir. 2015) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). The deliberate indifference standard has both objective and subjective prongs: "Whether a risk is substantial and the threatened harm is serious represents an objective test; whether prison officials consciously disregarded the risk represents a subjective one." Hinojosa, 807 F.3d at 665 (citation omitted).

The "subjective knowledge" prong "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S.

_____

1997). The claims herein are appropriately analyzed as episodic-acts-or-omissions claims. See Flores v. Cnty. of Hardeman, Tex., 124 F.3d 736, 738 (5th Cir. 1997) (applying Hare and Scott and classifying claim arising out of inmate's suicide as an episodic-acts-or-omissions claim, despite allegations regarding jail's training and staffing policies).

Ct. 1970 (citations omitted); <u>Hope v. Pelzer</u>, 536 U.S. 730, 738, 122 S. Ct. 2508, 2514, 153 L. Ed. 2d 666 (2002) (court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious") (citing <u>Farmer</u>, 511 U.S. at 842, 114 S. Ct. 1970); <u>Hinojosa</u>, 807 F.3d at 665 (quoting <u>Farmer</u>). "[T]o avoid liability, '[p]rison officials charged with deliberate indifference might show ... that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" <u>Hyatt v. Thomas</u>, 843 F.3d 172, 177 (5th Cir. 2016) (quoting <u>Farmer v. Brennan</u>, 511 U.S. at 844, 114 S. Ct. 1970); <u>see also</u> <u>Farmer</u>, 511 U.S. at 838, 114 S. Ct. 1970 ("an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

Under <u>Farmer</u>, "evidence that an official was aware of a substantial risk to inmate safety does not alone establish deliberate indifference." <u>Hyatt</u>, 843 F.3d at 177–78. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." <u>Id.</u> Indeed, "even if an officer responds without the

12

due care a reasonable person would use—such that the officer is only negligent—there will be no liability." Id. (citing Davidson v. Cannon, 474 U.S. 344, 347, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986)). The officer's actions must rise to the level of deliberate indifference, a high standard, before liability can be found. Id.

Plaintiff alleges that on the night of December 23, 2014, both defendants Brownlow and Banks knew that Michael Rhodes was a suicide risk and acted with deliberate indifference to his need for protection. She alleges that defendants Sheriff, Rushing and Edwards implemented or failed to implement suicide prevention policies, failed to train jail staff on suicide prevention measures, and failed to supervise jail staff, which manifested deliberate indifference to the serious medical needs of their detainees. She has thus alleged a constitutional violation at a high level of generality. See Thompson, 245 F.3d at 459. The question on the present motion is whether defendants' actions were objectively reasonable in light of clearly established law.

Sharley Brownlow

Applying these standards, the court concludes that defendant Brownlow's motion for summary judgment based on qualified immunity should be denied. Brownlow has admitted that Stubblefield told him that shortly prior to Rhodes' arrest, Rhodes had held a gun to his head. Brownlow also admits that Stubblefield told him that

Rhodes "might be a suicide risk." He claims, though, that he did not take Stubblefield's remark seriously and maintains that he cannot be held liable because he was not actually aware that Rhodes was a suicide risk. He submits that because he believed that Rhodes was not suicidal, it was not necessary to place him on suicide watch. He asserts claims that while this belief may have been incorrect or "unsound," it was not deliberately indifferent. However, construing the facts in the light most favorable to plaintiff, there is obviously a factual issue as to whether Brownlow knew that Rhodes was suicidal.

Brownlow testified that when he and Stubblefield first brought Rhodes into the jail, Stubblefield asked him to "keep an eye on [Rhodes] for the night" since Rhodes was intoxicated and "a bad drunk." Stubblefield, he claims, did not say anything at that time about Rhodes being suicidal. Brownlow has explained that since all the cells up front "in the suicide area" were full, he decided to put Rhodes in an empty cell "in segregation" so that Rhodes "could be by himself" instead of "in population," where he might have been at risk of getting "jumped" by another inmate. Brownlow testified that after they had put Rhodes in the segregation cell, as Stubblefield was walking out the door to leave, he, Brownlow, asked Stubblefield why Rhodes' clothes were muddy; Stubblefield responded by telling Brownlow about going to Rhodes' house earlier in the day and about the family telling him

that Rhodes was pointing a gun to his head. Brownlow testified that when he asked Stubblefield for more information about the gun incident, Stubblefield "laughed and joked and said that Mr. Rhodes might be suicid[al]."[9] Brownlow claims that Stubblefield was "saying [this] as a joke"; that "it wasn't like [Stubblefield] was telling [him] that [Rhodes] was suicidal. [He was] [j]ust sarcastically speaking."[10] And Brownlow asserts that because of the "sarcastic" manner in which Stubblefield said this, he did not think Rhodes was actually suicidal. He further states he does not recall Stubblefield ever saying that Rhodes needed to be placed on suicide watch.

In contrast to Brownlow's version of events, Stubblefield testified that when he first arrived at the jail and he and

---

[9] Brownlow signed a statement on March 8, 2017 prepared by his attorney which recited that he had asked Stubblefield to tell him more about the gun incident. He stated this in his deposition, as well; but he also testified in his deposition that he "didn't really ask [Stubblefield] to tell me more about that...." Regardless of whether Brownlow asked for more information about the gun incident, it is undisputed that Stubblefield told him that just prior to his arrest, Rhodes had been pointing a gun to his head.

[10] There is nothing to suggest that Brownlow thought Stubblefield was joking when he reported that before he was arrested, Rhodes had held a gun to his head for 45 minutes. Brownlow admits Stubblefield told him this and offers no explanation as to why he did not think this behavior indicated that Rhodes was potentially suicidal. Stubblefield's alleged "joking" or "sarcastic" manner aside, Brownlow admitted that this was something to be concerned about. Yet he still says he "didn't think [Rhodes] was suicidal."

Brownlow were getting Rhodes out of the car and walking him into the jail, he specifically told Brownlow that Rhodes "needed to be placed on suicide watch because he might be suicidal due to the fact that the family member stated that he had a gun to his head." Stubblefield states that he did not say this in a joking or sarcastic manner and that there was no doubt that Brownlow heard him. Another officer who was present confirmed that Stubblefield did not say this in a joking manner.

In addition to Stubblefield's testimony, Marie Chipley testified that she called the jail on the evening of December 23rd and expressed concern to Brownlow because her father was "threatening suicide" and had said that he "could not go on living." Brownlow admits he spoke with Chipley, but claims she only expressed concerns related to her father's "drinking problem" and nothing more.

For purposes of the present motion, the court must accept Stubblefield's and Chipley's testimony as true. In the court's opinion, their testimony is sufficient to permit a trier of fact to find that Brownlow had actual knowledge of a substantial risk of suicide, despite his professed belief otherwise. If, in fact, Brownlow knew that Rhodes was suicidal, then as a matter of clearly established law, he had a duty to take measures for Rhodes' protection. See Hyatt, 843 F.3d at 177-78 (stating that "the law is clearly established that jailers must take measures to

prevent inmate suicides once they know of the suicide risk").[11]  It

may not have been "established with any clarity as to what those

measures must be." Id.  Here, however, the record evidence

establishes that Brownlow essentially took no measures for Rhodes'

protection.  Instead, he gave Rhodes a mat, blanket and sheet,

dressed him in regular inmate clothing, put him in a segregation

cell with multiple tie-off points and then failed to check on

Rhodes at even arguably reasonable intervals.[12]  Any reasonable

officer in his position, assuming he knew Rhodes was a suicide

---

[11]    The Fifth Circuit has "highlight[ed] the importance of
appreciating the difference between the objective reasonableness
standard for qualified immunity ... and the subjective deliberate
indifference standard for section 1983 liability." Thompson v.
Upshur Cty., TX, 245 F.3d 447, 459 (5th Cir. 2001).  In Thompson,
the court explained that

> examples of behavior that does (and does not) constitute
> deliberate indifference are relevant in assessing the
> scope of clearly established law and, therefore, are
> relevant in determining whether the defendants' actions
> were objectively reasonable. ...  However, when the
> defendant moves for summary judgment based on qualified
> immunity, it is the plaintiff's burden to demonstrate
> that all reasonable officials similarly situated would
> have then known that the alleged acts of the defendants
> violated the United States Constitution. ...  That is
> different from the burden of establishing a genuine
> issue as to the defendant's deliberately indifferent
> subjective state of mind.

Id. (citations omitted).

[12]    Brownlow has given several different versions of how
often he checked on Rhodes.  In the version most favorable to
plaintiff, he checked on him only twice, the last time around
12:30 a.m.  Accepting that version as true, then it would follow
that Brownlow failed to check on Rhodes for more than five hours.

risk, would have known that these actions violated Rhodes'
constitutional rights.

The court acknowledges Brownlow's claims that he was short-
handed and unable to perform all his duties and also check on
Rhodes as often as jail policy required.  However, not only do the
jail logs fail to substantiate this claim, but the fact that he
would prioritize other duties, like handing out snacks, over
monitoring a suicidal inmate, is reflective of deliberate
indifference.  Moreover, viewing the evidence in the light most
favorable to plaintiff, he did not merely fail to check on Rhodes
at the intervals dictated by the jail's suicide prevention policy,
he failed to check on him *at all* for *five hours*.  No officer in
his position could have thought this was constitutionally
permissible.  <u>See</u> <u>Shepard v. Hansford Cty.</u>, 110 F. Supp. 3d 696,
710-11 (N.D. Tex. 2015) (finding deliberate indifference where
officer's violations of jail's fifteen-minute face-to-face suicide
watch policy "were pervasive and intentional"; where on multiple
occasions "she consciously chose to prioritize her other jail
duties" over her suicide watch duties; and where she never
informed the sheriff that she was unable to perform all the
required duties by herself and she never sought help with
maintaining the fifteen-minute suicide watch).

Based on the foregoing, it is manifest that Brownlow is not
entitled to summary judgment based on qualified immunity.

<u>Sandra Banks</u>

Sandra Banks was the booking/intake officer on duty when Rhodes was brought into the jail. Banks has testified that she had no interaction with Rhodes and neither Stubblefield nor Brownlow expressed any concern to her that Rhodes might be suicidal. Plaintiff has presented no evidence to the contrary. Plaintiff does assert that Banks ignored "an obvious risk of suicide," but she fails to explain how the risk of suicide would have been obvious to Banks. She suggests that Banks would have overheard Stubblefield tell Brownlow that Rhodes might be suicidal, but plaintiff offers no evidence to this effect, only speculation.

It is undisputed that Banks did not complete the booking process on Mr. Rhodes, either because Sergeant Brownlow, her supervisor, told her not to do so and/or because Mr. Rhodes' condition prevented her from doing so. Plaintiff notes that the intake screening form utilized at the jail included questions about the inmate's mental state. She argues that had Banks completed the screening process, as was her duty as the booking officer, then she would have discerned that Mr. Rhodes might be suicidal. She submits, alternatively, that had Banks kept Mr. Rhodes in the booking area until she was able to complete the booking process, as was indicated by jail policy, then she would have been able to keep him under observation. However, plaintiff

19

has pointed to no evidence that Banks actually knew that Rhodes was a suicide risk and accordingly, she cannot have acted with deliberate indifference.

Supervisory Liability

Supervisory officials may not be held liable under § 1983 on a theory of vicarious liability. Thompson v. Upshur Cnty., 245 F.3d 447, 459 (5th Cir. 2001) (citation omitted); Monell v. Dept. of Social Servs., 436 U.S. 658, 691-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (supervisory officials cannot be held liable under § 1983 for the actions of subordinates on any theory of vicarious liability). Rather, supervisory officials can only be held liable for their own unconstitutional conduct. Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010) (citing City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). This generally means that a supervisor may be held liable "'only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury.'" Porter, 659 F.3d at 446 (quoting Gates v. Texas Dep't of Prot. & Reg. Servs., 537 F.3d 404, 435 (5th Cir. 2008)). "A supervisor may also be liable for failure to supervise or train if: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the

failure to train or supervise amounts to deliberate indifference.'" Id. (quoting Goodman v. Harris Cnty., 571 F.3d 388, 395 (5th Cir. 2009)).

In the present case, plaintiff does not contend that Sheriff, Rushing or Edwards had direct personal involvement in any of the alleged acts or omissions which led to Michael Rhodes' death. Rather, they assert that these defendants are liable based on their failure to adopt, implement and/or otherwise execute a constitutionally adequate "suicide watch" policy, failure to train jail staff on how to recognize suicidal behavior and provide appropriate medical attention, and failure to supervise jail staff. For the reasons that follow, the court concludes that defendants are entitled to summary judgment as to these claims based on their qualified immunity.

First, the record evidence does not support plaintiff's contention that defendants failed to implement policies on suicide detection and prevention. Sheriff Sheriff did testify that he was not familiar with any jail policies or procedures relating to suicidal inmates and that to his knowledge, any policies that may have existed were not followed prior to December 23, 2014. In fact, however, all Sheriff's testimony establishes is that he was not personally aware of any policies and was not personally aware of whether any policies were followed because he had little to no personal involvement in or knowledge of jail operations, including

21

the adoption and implementation of jail policies and procedures and training of jail employees on such policies and procedures. That is because he delegated all authority and responsibility for jail operations to his warden, who he expected would handle all these matters on his behalf. He expected to become involved, he stated, only if there was a problem; and prior to Michael Rhodes' death, he was not aware of any problem with respect to jail employees' handling of suicidal inmates.

The record shows that in January 2014, then-Warden Mary Rushing, signed into effect comprehensive policies for the jail, which included suicide detection and prevention policies and procedures and which expressly provided for training of jail staff on all policies and procedures. The record indicates that training on jail policies was provided in October 2014; and thereafter, in early November 2014, Rushing sent a memorandum to all jail staff "RE: Suicide Plan for County Offenders", in which she directed all jail staff to "go over Suicide Plan at shift change briefing. This plan must be follow [sic] for all Offenders placed on Suicide. Please read and adhere to the attached written plan."[13]

With reference to plaintiff's failure-to-train theory, the law is clear that "[w]ithout notice that a course of training is

---

[13]     This is the Suicide Plan for County Offenders quoted, *supra*, page 4-5.

deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick v. Thompson, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011). Accordingly, to establish deliberate indifference based on a failure to train, a plaintiff must prove that the defendant had notice of the need for different or additional training.  She can do so in one of two ways:  "First, [she] can show that a pattern of similar incidents put the [defendants] on notice that [their] training was producing unconstitutional results.  See Sanders-Burns v. City of Plano, 594 F.3d 366, 381 (5th Cir. 2010). ... Or, second, [she] can show that the 'single incident exception' applies, in which case proving a pattern is unnecessary." Anderson v. Marshall Cty., Miss., 637 F. App'x 127, 134–35 (5th Cir.), cert. denied, 137 S. Ct. 67, 196 L. Ed. 2d 34 (2016). Plaintiff herein has no evidence of a pre-existing pattern of similar incidents.[14]  Therefore, she must rely on the single-incident exception to establish deliberate indifference.  This is a limited exception that applies only when there is an obvious need for specific training and the unconstitutional consequences of failing to train are "so patently obvious" that an official may be liable under § 1983 without proof of a pre-existing pattern of

---

[14]    The evidence shows that there were no previous suicides at the jail.

violations. <u>Connick</u>, 563 U.S. at 64, 131 S. Ct. 1350. Put
another way, a single incident may serve as a basis for liability
only if the plaintiff "prove[s] that the 'highly probable'
consequence of a failure to train would result in the specific
injury suffered, and that the failure to train represents the
moving force behind the [c]onstitutional violation." <u>Estate of
Davis ex rel. McCully v. City of N. Richland Hills</u>, 406 F.3d 375,
385-86 (5th Cir. 2005) ("[I]t may happen that in light of the
duties assigned to specific officers or employees the need for
more or different training is so obvious, and the inadequacy so
likely to result in the violation of constitutional rights, a
supervisor might reasonably be found to be deliberately
indifferent.") (quoting <u>City of Canton v. Harris</u>, 489 U.S. at 390,
109 S. Ct. 1197). This is an "extremely difficult" showing to
make. <u>Anderson</u>, 637 F. App'x at 134. <u>See</u> <u>also</u> <u>Walker v. Upshaw</u>,
515 Fed. Appx. 334, 341 (5th Cir. 2013) ("[T]he possibility of
single-incident liability based on a failure to train is rare, and
... a single incident is usually insufficient to demonstrate
deliberate indifference."). In the Fifth Circuit, "the exception
is generally reserved for those cases in which the government
actor was provided no training whatsoever." <u>Pena v. City of Rio
Grande City</u>, 879 F.3d 613, 624 (5th Cir. 2018). In fact, with one
exception, the Fifth Circuit "has consistently rejected
application of the single incident exception." <u>Arevalo v. City of</u>

<u>Farmers Branch, Texas</u>, No. 3:16-CV-1540-D, 2018 WL 1784508, at *6

(N.D. Tex. Apr. 13, 2018). That one exception was the case of

<u>Brown v. Bryan County</u>, 219 F.3d 450 (5th Cir. 2000), which the

Fifth Circuit has distinguished in numerous subsequent cases.

See, <u>e.g.</u>, <u>Davis</u>, 406 F.3d at 386 (explaining that single incident

liability was found in <u>Bryan</u> based on an "utter failure to

train"); <u>McClendon v. City of Columbia</u>, 258 F.3d 432, 442–43 (5th

Cir. 2001) (explaining that court found liability in <u>Bryan</u> under

single incident exception because county "failed to provide *any*

training or supervision for a young, inexperienced officer with a

record of recklessness[,]" and noting that "there is a difference

between a *complete failure to train*, as in <u>Bryan</u>, and a failure to

train in one limited area") (emphasis in <u>McLendon</u>).

In the case at bar, the evidence shows that at the time of

Michael Rhodes' death, Sergeant Brownlow had worked as a jailer at

the jail for approximately seven years. Over those years, the

facility had housed numerous suicidal inmates,[15] and yet there were

no incidents of suicide. Moreover, training records produced by

defendants show that Brownlow had received extensive prior

training, including training by the Mississippi Department of

---

[15] Gary Edwards estimated there had been hundreds of suicidal inmates.

25

Corrections in October 2014 that covered suicide prevention.[16]
Plaintiff has not demonstrated that this training was deficient in
any respect.[17] The evidence thus forecloses applicability of the
single-incident exception as a means of establishing liability on
a failure to train theory. See Riggins v. City of Indianola,
Miss., 196 F. Supp. 3d 681, 693–95 (N.D. Miss. 2016) (failure to
train theory failed where evidence showed that official received
training, including a state certification course and twenty-four
annual hours of training). It follows that defendants are
entitled to qualified immunity as to this claim.

---

[16] Defendants have produced a roster sheet for an October
2, 2014 training session at the jail which purports to show that
Brownlow, among others, received training on suicide prevention.
Plaintiff points to what she contends are indicia of the
document's having been fabricated (e.g., the document has a
completely different format than those from other training
sessions conducted the same month, and shows Gary Edwards as
warden, when the warden at the time was actually Rushing). She
asks that in the event the court finds the document relevant, she
be allowed discovery aimed at confirming (or dispelling) her
suspicions regarding the genuineness of the document. Because the
record otherwise demonstrates that Brownlow received training by
the State of Mississippi, including training on suicide
prevention, the subject document is not particularly relevant.
Accordingly, plaintiff's request for discovery will be denied. It
follows that defendants' motion to strike plaintiff's Rule 56(d)
declaration should and will be denied as moot.

[17] Plaintiff cites evidence the fact that Sergeant Brownlow
scored only 50% on a post-training test given after an October
2014 training session by YCRCF should have alerted defendants that
Brownlow needed additional training. The court is not persuaded
that his performance on a single test would have made it obvious
to defendants that he would likely commit a constitutional
violation if not given additional training, particularly since he
had worked at the jail for seven years without incident.

Plaintiff last argues, based on Brownlow's claim that he was unable to adequately monitor Rhodes because he was short-handed, that "[i]f the jury accepts that short staffing caused Michael Rhodes' death, then Mary Rushing and Gary Edwards are directly implicated under a failure to supervise theory of individual liability" because they were aware that the jail had experienced significant correctional officer attendance issues prior to Mr. Rhodes' death.  However, it is undisputed that when he realized he would be short-staffed, Sergeant Brownlow informed Rushing that he could manage without additional help.  And, as with the failure to train allegation, defendants could hardly have been deliberately indifferent to a need for greater supervision (or, more pertinently, for additional staffing) by the mere fact that the jail was short-staffed at times, where there had been no prior suicides as a result.

### State Law Negligence Claim

Defendants Brownlow, Sheriff, Banks, Rushing and Edwards have all moved to dismiss plaintiff's state law negligence claim against them on the basis of their immunity under § 11-465(3) of the Mississippi Tort Claims Act.  Plaintiff has not opposed this aspect of defendants' motion, which does appear to have merit.  Accordingly, the state law negligence claim will be dismissed.

<u>Conclusion</u>

Based on all of the foregoing, it is ordered that the motion of defendant Sharkey Brownlow for summary judgment on plaintiff's § 1983 claim is denied, and his motion for for summary judgment on the state law claim of negligence is granted. It is further ordered that the motion of defendants Sheriff, Banks, Rushing and Edwards for summary judgment in their individual capacities as to plaintiff's federal and state law claims is granted.[18]

SO ORDERED this 20th day of April, 2018.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[18] The supervisory defendants have filed a motion to strike the reference in plaintiff's response brief to a Study/Report of Lindsay M. Hayes. The court did not rely on this study/report, and accordingly, will deny the motion to strike as moot.