UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MARIE RHODES CHIPLEY, INDIVIDUALLY,
AS ADMINISTRATRIX OF THE ESTATE OF
MICHAEL RHODES, AND AS PERSONAL
REPRESENTATIVE OF MICHAEL WILLIAM
RHODES, DECEASED and MICHAEL ELLIS
RHODES, INDIVIDUALLY                                        PLAINTIFFS

VS.                                CIVIL ACTION NO. 3:16cv901-TSL-RHW

SERGEANT SHARKEY BROWNLOW,
INDIVIDUALLY                                                DEFENDANTS

MEMORANDUM OPINION AND ORDER

Plaintiffs Marie Rhodes Chipley, individually, as personal representative of Michael Rhodes, and administratrix of his Estate, and Michael Ellis Rhodes, individually, have filed two motions relating to the proposed expert testimony of Dr. Malcolm Taylor. First, pursuant to Federal Rules of Civil Procedure 702 and 403, they have moved to strike, or in the alternative to limit his testimony on the basis that the opinions expressed in his initial expert report are unreliable and/or irrelevant, in whole or in part. Second, they have moved pursuant to Federal Rules of Civil Procedure 26 and/or 37 to strike the supplemental affidavit/report of Dr. Taylor submitted by defendant Sharkey Brownlow in response to plaintiffs' first motion to strike and/or limit Dr. Taylor's testimony. Defendant Brownlow has responded in opposition to both motions. The court, having reviewed the parties' submissions on these motions, concludes that the motion

to limit Dr. Taylor's testimony and the motion to strike his supplemental declaration should be granted.

In this action, plaintiffs have sued defendant Sharkey Brownlow under 42 U.S.C. § 1983 to recover compensatory and punitive damages for the death of Michael Rhodes (Rhodes), who committed suicide while being held in the Yazoo County Regional Correctional Facility. They allege that Brownlow, a jailer at the facility, was deliberately indifferent to their father's constitutional right to protection from self-harm and thereby proximately caused his death. Brownlow has designated Dr. Malcolm Taylor, a physician board-certified in cardiology and internal medicine, to provide expert testimony regarding Rhodes' health from a cardiology perspective and his life expectancy.

In his expert report produced with Brownlow's expert designation, Dr. Taylor relates, based on his review of Rhodes' medical records, that at the time of his death, Rhodes suffered from a number of medical conditions, including severe chronic obstructive pulmonary disease (COPD) secondary to smoking three packs of cigarettes a day; bilateral severe peripheral vascular disease (PVD)/peripheral arterial disease (PAD),[1] for which he had required multiple vascular operations and stents; and hypertension and hyperlipidemia with low HDL (high cholesterol). In addition,

---

[1] Dr. Taylor uses the terms peripheral vascular disease (PVD) and peripheral arterial disease (PAD) to refer to the same condition. The court will refer to this condition as PAD.

Dr. Taylor relates that the autopsy on Rhodes revealed severe three-vessel coronary artery disease with severe left main stenosis. Citing various medical studies/articles concerning treatment and prognosis for some of these conditions, his expertise within the fields of cardiovascular and internal medicine and his experience of seeing and treating patients with these conditions on a regular basis, Dr. Taylor concludes in his report that "because of these serious and disabling diseases, Mr. Rhodes held a life expectancy of 65 years at the time of his death." Mr. Rhodes was sixty years old at the time of his death.

On November 15, 2018, plaintiffs filed a motion to strike or limit Dr. Taylor's testimony. In that motion, plaintiffs do not challenge Dr. Taylor's qualifications, but they argue that his proposed testimony is unreliable for a number of reasons, including that Dr. Taylor fails to explain the method he used to calculate life expectancy; references stray principles relating to matters that have no relevance to this action, e.g., regarding amputation rates, emotional well-being, quality of life and the incidence of tumors in patients with PAD; cites certain mortality rates without relating them to the facts of this case in any discernable way; cites a number of medical articles or parts of articles that either do not appear to support his opinion, do not have any bearing on the facts of this case and/or are not

identified with sufficient specificity; and expresses opinions that are beyond his field of expertise.

Brownlow has responded in defense of Dr. Taylor's report and with his response, has filed a declaration of Dr. Taylor. In his declaration, Dr. Taylor undertakes to address the subject of some of plaintiffs' objections to his report. First, he affirms that the source of the various articles cited in his report, UpToDate.com, is a current and reliable resource on which physicians rely.[2] He goes on to explain that his initial report referenced Rhodes' long-standing and ongoing PAD because this was part of Rhodes' overall health condition at the time of his death and because "it is necessary to consider an individual's overall health condition and especially any long-standing or chronic disease processes while reaching an ultimate conclusion on life expectancy." He explains that when a patient has PAD, that "usually means that a patient also suffers from diseased arteries in other parts of his body, including the heart, and in particular, the left main coronary artery," which, as the autopsy revealed, was true in Rhodes' case. Dr. Taylor then adds:

> Mr. Rhodes' PAD in his legs was very advanced at the time of his death and would probably have led to

---

[2] Plaintiffs' objection to articles on which Dr. Taylor purportedly relied in his initial report did not relate to the *source* of the articles (UpToDate.com); rather, their objection was that the specific articles he cited did not appear to relate to and/or support the opinions he expressed in his report.

4

> amputation of both his legs, which means that this
> condition would also have affected his overall life
> expectancy and his quality of life prior to his death.
> A patient's loss of his legs would likely lead to
> depression as well as other possible medical
> complications, including infections and additional
> amputations or revisions. Additionally, it would
> physically affect his ability to interact on a regular
> basis with family members who live outside his
> household.

He continues, stating:

> My opinion that Mr. Rhodes' life expectancy was only
> five years is supported by my experience and the results
> of his autopsy report. The autopsy report showed an
> enlarged heart ("marked cardiomegaly"), severe
> atherosclerosis of multiple cardiac vessels, including
> the right coronary artery, the left main coronary
> artery, and left ventricular hypertrophy of the heart.
> All of these put Mr. Rhodes at increased risk of sudden
> cardiac death. Further, based on his history, it is
> likely he would have gone without any significant
> treatment for these disease processes, increasing his
> risk of sudden death even more.

Attached to his declaration is an article entitled "The Prognostic Spectrum of Left Main Stenosis," which he asserts supports his opinion. Plaintiffs have moved to strike Dr. Taylor's declaration with supporting exhibit on the basis that it consists of "new, different, and unreliable opinions disclosed after the expiration of the discovery deadline based on information provided before the discovery deadline...."

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Civil Procedure, which states that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may provide expert testimony if his

5

"scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and his testimony "is based on sufficient facts or data; ... is the product of reliable principles and methods; and ... [he] has reliably applied the principles and methods of the facts to the case". Fed. R. Evid. 702. The Supreme Court has found this rule to impose on the trial judge a special obligation to ensure that only expert testimony which is both reliable and relevant be admitted. Kumho Tire Co. V. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

"To be reliable, an expert opinion must be based on sufficient facts and data, and be the product of reliable principles and methods. Otherwise, it is unsupported speculation or subjective belief." Weiser-Brown Operating Co. V. St. Paul Surplus Lines Inc. Co., 801 F. 3d 512, 529 (5th Cir. 2015) (internal quotation marks and citations omitted). The proponent of expert testimony has the burden to establish reliability by a preponderance of the evidence. Moore v. Ashland Chem. Inc., 151 F. 3d 269, 277 (5th Cir. 1998). "[W]here [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has "a reliable basis in the

6

knowledge and experience of [the relevant] discipline." Kumho Tire Co. V. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167 (citing Daubert, 509 U.S., at 592, 113 S. Ct. 2786). See also N.S. v. City of Alexandria, 919 F. Supp. 2d 773, 785 (W.D. La. 2013) (court must assess whether reasoning or methodology underlying expert's testimony is valid and must exclude testimony based merely on subjective belief or unsupported speculation) (citing Daubert, 509 U.S. at 590, 113 S. Ct. 2786). The court's assessment of reliability "is flexible and necessarily fact-specific." Thomas v. Chambers, No. CV 18-4373, 2019 WL 1670745, at *2 (E.D. La. Apr. 17, 2019) (citing Seatrax, Inc. V. Sonbeck Int'l, Inc., 200 F.3d 358, 372 (5th Cir. 2000)). Ultimately, the court's purpose in evaluating reliability is to "make certain an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field." Kumho Tire Co., 526 U.S. at 152, 119 S. Ct. 1167).

The court must also determine whether the expert's proposed testimony is relevant, that is, whether the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 584 (5th Cir. 2003) (citing Daubert, 509 U.S. at 591-92, 113 S. Ct. 2786). If "the jury could adeptly assess [the] situation using only their common experience and knowledge" then "expert

7

testimony [is] unnecessary." Peters v. Five Star Marine Serv., 898 F.2d 448, 450 (5th Cir. 1990).

As noted *supra*, in his report and subsequent declaration, Dr. Taylor addresses the state of Rhodes' health at the time of his death and he ultimately concludes that due to Rhodes' PAD and related coronary artery disease, he had a five-year life expectancy at the time of his death. The court cannot discern from Dr. Taylor's report and/or declaration a sufficient basis for this conclusion. Dr. Taylor's initial report mentions Rhodes' COPD and high cholesterol but does not indicate whether or to what extent either condition had on his overall health or his life expectancy. Dr. Taylor discusses Rhodes' severe PAD and cites various five-year mortality rates for symptomatic PAD (ranging from 7.7% to 24%, 15% to 30% and 30% to 42%[3] at five years), yet he does not explain how these statistics bear on his opinion as to Rhodes' life expectancy.[4] He recites that "[t]he degree of

---

[3] According to his report, one of the articles he cites purportedly identifies a 20% rate of non-fatal myocardial infarction and a 15% to 30% death rate (with 75% of the deaths from cardiovascular disease). Another states that older studies reported five- and ten-year mortality rates among PAD patients with intermittent claudication (pain due to decreased blood flow) at 30% to 42% and 50% to 65%, respectively, whereas a later study reported a five-year mortality rate in symptomatic patients of 7.7% to 24%.

[4] As Dr. Taylor has explained that patients with PAD typically also have atherosclerosis in other parts of their bodies, including the heart, it is not surprising that the statistics referenced by Dr. Taylor indicate that a significant percentage of deaths in patients with PAD are attributable to

8

impairment in symptomatic patients may also predict mortality," but he does not elaborate and does not relate this to Rhodes. Dr. Taylor's initial report also references the prevalence of tumors and tumor-related deaths in patients with PAD, but he does not suggest that Rhodes had any tumors, or for that matter, that he was likely to develop tumors or that any tumors he might develop would have had any bearing on his life expectancy. As noted, Dr. Taylor does state in his subsequent declaration that Mr. Rhodes' PAD would probably have led to amputation of both his legs, which "would ... have affected his overall life expectancy." But not only has Dr. Taylor failed to explain how he accounted for the potential of such amputations in his calculation of Rhodes' life expectancy, he has also failed to identify any basis for his conclusion that Rhodes likely would have required amputation of his legs.[5] The latter is a particularly glaring omission, given that the medical literature cited by Dr. Taylor regarding amputation rates in patients with PAD indicate a low risk of

---

cardiovascular disease. It would seem likely that those deaths would be subsumed in the mortality rate for cardiac-related deaths of patients with PAD.

[5] Brownlow points out that Rhodes' medical records reflect that his cardiovascular surgeon told him that if he did not stop smoking, he could experience "possible extremity amputation" and that Rhodes himself expressed a fear of amputation to family members and friends. However, none of this supports Dr. Taylor's assertion that Rhodes would likely have required amputation of his legs.

9

amputation.[6] In short, his report and/or declaration disclose no basis for his opinion that amputation was likely[7] and such testimony will not be allowed.[8]

Regarding Rhodes' coronary artery disease with left main stenosis, which was first discovered at autopsy, Dr. Taylor states

---

[6] Dr. Rhodes' initial report cited one article reporting amputation rates in patients with PAD of 7% within five years and 12% within ten years. Plaintiffs have pointed out that this article goes on to state that "recent studies suggest that major amputations are relatively rare in these patients, with only 1% to 3.3% of patients needing major amputation during a 5-year period" and that "two large population-based studies found that less than 2% of patients with peripheral arterial disease required major amputation." The statistics themselves do not suggest that Rhodes was at a significant risk for amputation. Beyond statistics, Dr. Taylor has offered no basis for his conclusion that Rhodes' PAD was likely to lead to the amputation of both of his legs. Dr. Taylor has not identified what, if anything, about Rhodes' condition that made amputation likely.

[7] Not only does Dr. Taylor not provide a basis for his opinion that amputation was likely, but to the extent he further contends that amputation would have led to other medical complications, such as infections and additional amputations or revisions, his opinion is not factually supported and is speculative.

[8] Dr. Taylor states in his initial report that "patients with intermittent claudication have a poor quality of life and high rates of depression," and that the "adverse impact on the patient's physical and emotional well-being is directly related to walking ability." However, the quality of Rhodes' life, had he lived, would be relevant only insofar as it might bear on his relationship with plaintiffs. On that subject, Dr. Taylor has stated only that amputation would have adversely affected Rhodes' relationship with his family. In the court's opinion, not only is Dr. Taylor not qualified to provide an expert opinion on that subject, but since he will in any event be precluded from testifying that Rhodes' legs would have been amputated had he lived, it follows that he will also be precluded from offering testimony regarding the effect amputation would have had on Rhodes' relationship with plaintiffs.

10

in his initial report that "[l]eft main stenosis has the highest mortality rate for patients with coronary artery disease ranging from 50% to 60% in 3 years." He reiterates in his recent declaration that because of his severe coronary artery disease, Rhodes was at increased risk of sudden cardiac death, which Dr. Taylor posits was further increased by the likelihood that Rhodes would not have sought significant treatment for this condition.[9] While Dr. Taylor cited numerous (and several lengthy) articles in his initial report, he did not identify any source for this 50% to 60% three-year mortality rate for individuals with coronary artery disease with left main stenosis. With his recent declaration, he did attach an article entitled "The Prognostic Spectrum of Left Main Stenosis", which describes a study of survival rates of patients with left main stenosis, including patients with three-vessel disease. However, that study was conducted forty to fifty years ago (from November 1969 to June 1977) and involved patients who received no significant medical treatment for their heart disease, such as angioplasty or bypass surgery.[10] And while Dr.

---

[9] Plaintiffs argue that Dr. Taylor's statement in his declaration that Rhodes was at risk of "sudden cardiac death" is a new opinion that was not timely disclosed. It appears to the court this is merely an elaboration on his initially asserted opinion on Rhodes' prognosis in view of the heart disease discovered at autopsy.

[10] Indeed, at the time of the study, coronary angioplasty was nonexistent and bypass surgery was in its infancy. See [*Thirty years of the balloon catheter--A. Grüntzig and percutaneous balloon angioplasty*], https://www.ncbi.nlm.nih.

Taylor asserts that Rhodes likely would have gone without any significant treatment for his coronary artery disease, he does not say what in Rhodes' history led him to that conclusion. His own report chronicles Rhodes' extensive treatment for PAD in the several years preceding his death, which included six revascularization procedures in less than four years.[11] Dr. Taylor also does not assert that treatment was not available or that available treatment options would not have improved Rhodes' prognosis, only that Mr. Rhodes would not have sought significant medical treatment. Such testimony appears entirely speculative.

Based on all of the foregoing, the court concludes that plaintiffs' motion to limit Dr. Taylor's testimony should be granted, as should their motion to strike Dr. Taylor's supplemental declaration. The court does not find that Dr. Taylor should be precluded from testifying altogether. He could permissibly offer testimony regarding Rhodes' overall health at the time of his death. That is, he could identify and explain the nature of Rhodes' various medical conditions. However, for the

---

gov/pubmed/15730223 (reporting that coronary angioplasty was developed by Andreas Roland Gruentzig and was first performed in Zurich in September, 1977); [*Fifty years of coronary artery bypass grafting*], https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5906252/ (reporting that first successful coronary artery bypass grafting (CABG) procedures in United States were performed in late 1960s though they were not published until 1973).

[11] Notably, Dr. Taylor does not say that many or most patients do not seek treatment; rather, he said only that Rhodes, based on his history, would not likely have done so.

reasons explained herein, Dr. Taylor will be precluded from offering an opinion as to Rhodes' life expectancy; testifying that Rhodes' PAD would probably have resulted in the amputation of his legs or offering an opinion as to the effect of amputation on his relationship with plaintiffs; or referring to tumors or tumor-related deaths in patients with PAD.

Accordingly, it is ordered that plaintiffs' motion to limit Dr. Taylor's testimony is granted to the extent set forth herein, and their motion to strike his supplemental declaration is also granted.

SO ORDERED this 25th day of April, 2019.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE